**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**UNITED STATES OF AMERICA**                    **CRIMINAL DOCKET**

**VERSUS**                                                          **No. 05-314**

**HENRY A. DILLON, III**                                   **SECTION "I"**

<u>**ORDER AND REASONS**</u>

Before this Court is the motion of defendant, Henry A. Dillon, III ("Dillon"), to vacate, set aside, or correct his conviction and/or sentence pursuant to 28 U.S.C. § 2255. For the following reasons, Dillon's motion is **DENIED** and **DISMISSED WITH PREJUDICE**.

*BACKGROUND*

On May 4, 2006, a jury found Dillon, a former Orleans Parish City Attorney, guilty of two counts of depriving individuals of their civil rights in connection with his rape of two women, Carolyn Carter ("Carter") and Sandy Carraby ("Carraby"), while acting under color of law, in violation of 18 U.S.C. § 242.[1] Dillon was represented at trial by Michael S. Fawer, Esq. ("Fawer") and on appeal by John Wilson Reed, Esq. ("Reed").

*1. Dillon's Trial and Appeal*

Affirming Dillon's conviction, the United States Court of Appeals for the Fifth Circuit succinctly stated the facts of this case as follows:

> Dillon was an attorney licensed to practice law in the state of Louisiana where he maintained a private practice. Dillon also served as an Assistant City Attorney ("ACA") for the City of New Orleans. In the latter capacity, he was assigned, on a part-time basis, to prosecute minor

---

[1] R. Doc. Nos. 144-46.

1

municipal offenses and traffic violations in the local municipal and traffic courts on behalf of the City of New Orleans. These courts operate informally with most cases resolved summarily at arraignment. Defendants often appear unrepresented and resolve their cases directly with the prosecutors, who exercise substantial discretion.

### I. Carolyn Carter

Carter met Dillon after being arrested in December of 2003 for a minor traffic offense. One of her friends suggested that she talk to Dillon to see if he could help her with her tickets because he was an ACA. She followed this advice and Dillon arranged for the dismissal of some of her pending tickets. On January 15, 2004, Carter returned to traffic court to address the remaining tickets pursuant to Dillon's promise to fix them. That afternoon Carter learned that her son had been arrested on a municipal battery charge, and she sought Dillon's assistance in securing his release from jail. Dillon told Carter to come, alone, to his private law office later that day to discuss her son's situation.

Carter testified that she arrived at Dillon's office around 9:00 p.m. Dillon then asked her to give him her son's name, date of birth, and social security number. Dillon then called a state court judge to arrange for Carter's son to be "paroled."[2] After placing the call, Dillon told Carter, "I told you I can make it happen." At that point, Carter attempted to leave, but Dillon stopped her, began kissing her, and pushed her into another room. Once in the other room, Dillon told Carter that he knew "a lot of police officers and he [could] have anybody arrested" and that if she wanted her son out of jail she should "[q]uit acting like a baby." Dillon proceeded to rape Carter. Dillon then told Carter to clean herself up, and she left his office. Dillon left her with the impression he could have her son re-arrested at any time. Carter did not report this incident until after she learned Dillon was arrested for attacking Carraby.

### II. Sandy Carraby

On July 2, 2004, Carraby was arrested on municipal charges of lewd conduct and trespassing. She had previously been charged with possession of marijuana. Carraby appeared at municipal court on the lewd conduct and trespassing charges pursuant to a notice on November 30, 2004. According to local practice, Carraby was sent to discuss her case with Dillon because he was the ACA for the court to which her case was assigned. Carraby testified that when she went into Dillon's office at

---

[2] In Orleans Parish, state court judges can exercise their "parole power" to secure the release of arrestees on their own recognizance.

the courthouse he asked her inappropriate questions about what clothes she was wearing when she was arrested and whether she had sex with her boyfriend.  They also discussed Carraby's state marijuana charge.[3] Dillon told her that she would have to take a drug test because of the marijuana charge, so she should come to his "other" office later that day to take the test.

At 1:00 p.m., Carraby came to Dillon's office with her aunt, but when she went upstairs to his office, it was locked.  As Carraby came back downstairs, Dillon arrived at the building. Dillon told Carraby to have her aunt wait in the car, and the two of them then proceeded to Dillon's office.  Once there, Dillon asked Carraby for her phone number, date of birth, and social security number. He then placed a phone call.[4] After placing this call, Dillon approached Carraby and began kissing her. She attempted to resist and Dillon told her that nobody would believe her over him if she reported him because she had "lewd conduct on [her] record."  Then he forcibly held her down, pulled down her pants, and raped her.  Afterwards, Carraby testified that Dillon threatened her to keep quiet or else he would "come after me and my family." Carraby left Dillon's office and drove home with her aunt.  Once she arrived at her aunt's house, she told her family that she had been sexually assaulted by Dillon.  The authorities were notified and Dillon was arrested the following day. Carraby also underwent a rape examination that evening. During that examination, the nurse noted that Carraby was suffering from pain to her back and genital area but that the physical evidence of sexual activity was equally consistent with consensual intercourse as it was with nonconsensual intercourse.

### III. [District] Court Proceedings

On December 2, 2005, Dillon was charged in a two-count indictment with depriving individuals of their civil rights under color of law in violation of 18 U.S.C. § 242. Count one charged Dillon with depriving Carraby of her bodily integrity by sexually assaulting her.  It also asserted that Dillon's conduct constituted "aggravated sexual abuse" that resulted in "bodily injury."   Count two similarly charged the defendant with depriving Carter of her bodily integrity by sexually assaulting her.    It also asserted that Dillon's conduct constituted "aggravated sexual abuse" that resulted in "bodily injury."

---

[3] The government [acknowledged on appeal] that the marijuana charge had been refused by the district attorney's office weeks before Carraby met Dillon, but Carraby testified that she did not know the status of the marijuana charge when she appeared in municipal court.

[4] Carraby testified that she did not know whom Dillon called; Dillon testified that he called the clerk's office to check the status of Carraby's marijuana charge.

Before trial, the government timely gave notice that it was seeking to introduce evidence of four other alleged sexual assaults committed by Dillon under Federal Rule of Evidence 413. Dillon objected that this evidence was substantially more prejudicial than it was probative, and therefore, should not be admitted according to Federal Rule of Evidence 403. On April 7, 2006, the district court issued its written Order and Reasons holding that it would admit testimony relating to two of the four prior alleged sexual assaults.

The case proceeded to trial and verdict. Dillon testified, admitted sexual intercourse with Carraby and Carter on the occasions alleged, but asserted that it was entirely consensual. The jury found Dillon guilty on count one (Carraby), and found that Dillon's acts resulted in "bodily injury" and included "aggravated sexual abuse." The jury found Dillon guilty on count two (Carter), and found that Dillon's acts included "aggravated sexual abuse" but did not result in "bodily injury." Dillon moved for judgments of acquittal at the close of the prosecution's case and again at the close of all the evidence. These motions were denied. The district court sentenced Dillon to life imprisonment on each count, to be served concurrently. Dillon filed a timely appeal.

*United States v. Dillon*, 532 F.3d 379, 382-84 (5th Cir. 2008).

Further, summarizing the issues litigated on appeal and its holdings, the Fifth Circuit stated:

Dillon's contentions on appeal [were] that there was not sufficient evidence to show that he acted under color of law when he sexually assaulted his victims, and that the district court abused its discretion in admitting evidence of two other alleged sexual assaults by him under Federal Rule of Evidence 413. We hold that the evidence was sufficient to support the finding that the charged assaults were under color of law, and that the district court did not abuse its discretion in admitting evidence of the two other assaults under Rule 413. We accordingly affirm.

*Id*.

### 2. *Collateral Proceedings*

Dillon timely filed the present motion to vacate, set aside, or correct his conviction and/or

sentence pursuant to 28 U.S.C. § 2255.  Dillon raises numerous arguments in such motion, almost all of which assert that either Fawer or Reed provided Dillon with ineffective assistance of counsel at trial and on appeal, respectively.  Both lawyers have supplied affidavits responding to Dillon's contentions.  The government responded to Dillon's § 2255 motion.  Dillon subsequently filed a reply.

With respect to trial counsel, Dillon first asserts that Fawer was ineffective for "fail[ing] to introduce crucial exculpatory evidence impeaching four primary government witnesses, fail[ing] to subpoena defense witnesses, and fail[ing] to argue evidence corroborating testimony favorable to the defense . . . ."[5]  Second, Dillon maintains that Fawer was ineffective by "fail[ing] to avoid conflicts of interest, or to inform [Dillon] of such . . . ."[6]  Specifically, Dillon alleges that Fawer "pulled his punches" at trial in order to please the government because the government was allegedly investigating Fawer with respect to an unrelated matter at the time. Third, Dillon argues that Fawer was ineffective by "failing to appeal the lack of notice of Rule 413 witnesses at the detention hearing . . . ."[7]  Fourth, Dillon posits that Fawer was ineffective by "fail[ing] to investigate and argue [a] politically motivated prosecution defense, prosecutorial misconduct, and selective prosecution . . . ."[8]  Fifth, Dillon contends that Fawer was ineffective by "fail[ing] to argue [that the Court gave an] improper jury instruction and to appeal [the Court's] lack of jurisdiction . . . ."[9]

---

[5] R. Doc. No. 180-1, pg. 8.

[6] *Id*. at 40.

[7] *Id*. at 45.

[8] *Id*. at 54.

[9] *Id*. at 57.

With respect to appellate counsel, Dillon first argues that Reed provided ineffective assistance by failing to argue that Fawer was ineffective at trial.  Second, Dillon argues that Reed provided ineffective assistance by failing to file a writ of certiorari with the United States Supreme Court following the Fifth Circuit's denial of Dillon's appeal.

### LAW

### 1.  Overview of § 2255

Section  2255(a) provides a prisoner in custody with four grounds upon which relief may be granted: (1) "that the sentence was imposed in violation of the Constitution or laws of the United States"; (2) "that the court was without jurisdiction to impose such sentence"; (3) "that the sentence was in excess of the maximum authorized by law"; or (4) that the sentence "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a) (2008); *see Hill v. United States*, 368 U.S. 424, 426-27, 82 S. Ct. 468, 470, 7 L. Ed. 2d 417 (1962).  Section 2255 is designed to remedy constitutional errors and other injuries that could not be brought on direct appeal and would result in injustice if left unaddressed.  *See United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999).  "Relief under § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice." *United States v. Segler*, 37 F.3d 1131, 1133 (5th Cir. 1994) (quoting *United States v. Vaughn*, 955 F.2d 367, 368 (5th Cir. 1992) (per curiam)).   A federal prisoner cannot assert a non-constitutional claim on collateral attack if he did not raise it on appeal.  *Davis v. United States*, 417 U.S. 333, 345-46 n.15 (1974).  Unlike direct appeals, motions under § 2255 reach only errors of constitutional or jurisdictional magnitude.  *United States v. Capua*, 656 F.2d 1033, 1037 (5th Cir. 1981).

"[A] proceeding under Section 2255 is an independent and collateral inquiry into the validity of the conviction . . . ." *United States v. Hayman*, 342 U.S. 205, 222-23, 72 S. Ct. 263, 274, 96 L. Ed. 232 (1952). If the court determines that the prisoner is entitled to relief "[it] shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b). "The § 2255 remedy is broad and flexible, and entrusts to the courts the power to fashion an appropriate remedy." *United States v. Garcia*, 956 F.2d 41, 45 (4th Cir. 1992) (citing *Andrews v. United States*, 373 U.S. 334, 339, 83 S. Ct. 1236, 1239, 10 L. Ed. 2d 383 (1963)). Pursuant to § 2255, the Court must grant defendant a hearing to determine the issues and make findings of fact and conclusions of law unless "the motion, files, and records of the case conclusively show that the prisoner is entitled to no relief." *United States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992).

### 2.  *Overview of Ineffective Assistance of Trial Counsel*

The standard for judging the performance of counsel was established by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In *Strickland,* the Court established a two-part test for evaluating claims of ineffective assistance of counsel that requires the petitioner to prove (1) deficient performance and (2) resulting prejudice. *Strickland,* 466 U.S. at 697. Deficient performance is established by "show[ing] that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see also United States v. Kimler,* 167 F.3d 889, 893 (5th Cir. 1999). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694.

7

In *Strickland*, the Supreme Court observed that "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Id*. at 689.  Under Fifth Circuit jurisprudence, a reviewing court must strongly presume that counsel exercised its reasonable professional judgment. *Lockhart v. McCotter*, 782 F.2d 1275, 1279 (5th Cir. 1986) (internal citation omitted).  Further, "second-guessing is not the test for ineffective assistance of counsel."  *King v. Lynaugh,* 868 F.2d 1400, 1405 (5th Cir. 1989).  An attorney's strategic choices, usually based on information supplied by the defendant and gathered from a thorough investigation of the relevant law and facts, are virtually unchallengeable. *Strickland,* 466 U.S. at 691.  "It is not enough to show that some, or even most, defense lawyers would have handled the case differently."  *Green v. Lynaugh*, 868 F.2d 176, 178 (5th Cir. 1989).  Additionally, any failure on the part of the attorney must be specifically pleaded and proven.  *Knighton v. Maggio*, 740 F.2d 1344, 1349 (5th Cir. 1984); *see also Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983) ("Mere conclusory allegations do not raise a constitutional issue in a habeas proceeding.").   Further, an attorney's failure to raise a meritless argument cannot serve as the basis of a successful ineffective assistance of claim because the result of the proceeding would not have been different had the attorney raised the issue.  *Kimler*, 167 F.3d at 892.

On federal habeas review, scrutiny of counsel's performance "must be highly deferential," and the Court will 'indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance." *Moore v. Johnson,* 194 F.3d 586, 591 (5th Cir. 1999) (citing *Strickland,* 466 U.S. at 689). In assessing counsel's performance, a federal habeas court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances

8

of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time of trial. *Strickland,* 466 U.S. at 689; *Neal v. Puckett,* 286 F.3d 230, 236-37 (5th Cir. 2002). "A court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." *Bell v. Cone,* 535 U.S. 685, 701 (2002) (citing *Strickland,* 466 U.S. at 689). Federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise. *Strickland,* 466 U.S. at 689.

The second prong of the *Strickland* test looks to the prejudice caused by counsel's deficient performance. This requires "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *United States v. Mullins,* 315 F.3d 449, 456 (5th Cir. 2002) (*quoting Strickland,* 466 U.S. at 687). "[T]he defendant must show that counsel's errors were prejudicial and deprived defendant of a 'fair trial, a trial whose result is reliable.'" *United States v. Baptiste,* No. 98-207, 2007 U.S. Dist. LEXIS 21388, at *11 n. 6, 2007 WL 925894 (E.D .La. Mar. 26, 2007) (Engelhardt, J.) (quoting *Strickland,* 466 U.S. at 687). "This burden generally is met by showing that the outcome of the proceeding would have been different but for counsel's errors." *Id.*

A defendant must satisfy both prongs of the *Strickland* test in order to be successful on an ineffective assistance claim. *See Strickland,* 466 U.S. at 697. There is no reason for a court deciding an ineffective assistance of counsel claim to address these prongs in any particular order. *Id.* If it is possible to dispose of an ineffective assistance of counsel claim without addressing both prongs "that course should be followed." *Id.*

### 3. *Overview of Ineffective Assistance of Appellate Counsel*

"The entitlement to effective assistance does not end when the sentence is imposed, but extends to one's first appeal of right." *United States v. Williamson,* 183 F.3d 458, 462 (5th Cir.1999).  Appellate counsel's performance is evaluated under the same *Strickland* standard as is trial counsel's performance.  *Id*.  "To prevail, [the defendant] must establish, first, that his attorney's representation was deficient and, second, that the deficient performance caused him prejudice."  *Id.*  With respect to the deficient performance prong in the appellate context, the Fifth Circuit has stated that "[c]ounsel does not need to 'raise every nonfrivolous ground of appeal available.'  Nonetheless, a reasonable attorney has an obligation to research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful."  *Id. (*quoting *Green v. Johnson,* 160 F.3d 1029, 1043 (5th Cir.1998)).  With respect to the prejudice prong, the defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional error[ ], the result of the proceeding would have been different."  *Id.* at 463 (quoting *Jones v. Jones,* 163 F.3d 285, 302 (5th Cir.1998)) (alteration in original) (internal quotation marks omitted). "A reasonable probability is that which renders the proceeding unfair or unreliable, *i.e.,* undermines confidence in its outcome."  *Id.*

## ANALYSIS

### 1. *Trial Counsel's Alleged Failure to Introduce Potentially Exculpatory Evidence for the Purpose of Impeaching Four Witnesses*

#### a.  **Sandy Carraby and Mary Hurley**

Dillon argues that Fawer was ineffective for "fail[ing] to introduce crucial exculpatory evidence impeaching" Carraby and Hurley.  Dillon argues that such evidence would have corroborated his testimony that Carraby went to his office to discuss with Dillon the possibility of bringing a lawsuit in connection with her involvement in an automobile accident.  As such,

Dillon maintains that the evidence would have undermined the government's argument and evidence that Dillon acted under color of law when he lured Carraby to his private law office under the ruse that she had to take a drug test in order to clear a marijuana charge from her criminal records.

By way of background, shortly after Dillon raped Carraby, Hurley wrote a letter to the Louisiana Attorney Disciplinary Board ("Disciplinary Board"), in which she reported Dillon's sexual assault upon her niece.  The letter was forwarded to Dillon's then-attorney, Jack Martzell, Esq. ("Martzell"), who complained to the Disciplinary Board that third-parties were not permitted to file ethical complaints against lawyers.  The Disciplinary Board agreed with Martzell and informed Hurley that if a complaint was to be lodged against Dillon, Carraby had to be the person to lodge it.

Not long thereafter, the Disciplinary Board received a complaint against Dillon purportedly bearing Carraby's signature.  The complaint was submitted on the Disciplinary Board's stock "ethical conduct complaint form."  At trial, Carraby denied that she had completed or signed the ethical conduct complaint form.  Although Hurley acknowledged that she wrote the initial letter to the Disciplinary Board, she also asserted that she did not complete or sign the ethical conduct complaint form.  However, both Carraby and Hurley acknowledged that other members of Carraby's family, such as Carraby's father, were involved in the attempt to lodge a formal disciplinary complaint against Dillon.

Because Dillon makes much with respect to the contents of the ethical conduct complaint form, the Court will describe it in detail.  As stated, the ethical complaint conduct form is a stock form on which printed questions are followed by blank lines providing a space to input answers

to the form's questions.  In pertinent part, the form states the following questions and contains

the following responses with respect to Dillon:

**WHEN DID YOU HIRE THIS ATTORNEY?**  At the court house

**WHAT DID YOU HIRE THIS ATTORNEY TO DO FOR YOU?**  Clean up my

Records.[10]

The ethical conduct complaint form then provides a space for the complainant to state the

complaint.  In the space provided for doing so, the handwritten response contained on the form

states:

> I just want to see justice taken against Mr. Dillon Because [sic] their [sic]
> are many other young ladies out Here [sic] I  I [sic] wouldn't want him
> to take advantage of anyone else this way.  And this is his 4th time with
> the same offense.[11]

The ethical conduct complaint form then provides a space for the complainant to explain

the complaint.  In the space provided for doing so, the handwritten response contained on the

form states:

> Had to go to court for Retrial [sic] and I saw Mr. Dillion [sic] and he
> asked me if I need him to help me get my Records [sic] cleaned up.  And
> I said yes.  So he gave me an address and a phone number and told me to
> meet him at 1pm at 2475 Canal Street Suite 303.  So me and my auntie
> went of there [sic] and he wasn't there the first time so we was going
> headed back [sic] to the car and he saw me and said of [sic] come on up
> stairs.  I'm sorry I'm running late And [sic] he told my Auntie she can
> stay down stairs that it will only take about 10 to 15 minutes he said to
> do what he had to do.  So about 20 minutes later I went back downstairs
> and my Auntie asked what was wrong why was I crying and had that
> look on my face.  So I was crying all the way home and she Kept [sic]
> asking what was wrong with me [sic] when we got home I called my
> mother at work and told her but she was in Franklinton, LA during

---

[10] R. Doc. No. 119-2, pg. 1.

[11] *Id*. at 2.

> inventory so she told my Auntie to call the Rape Crisis Center and told
> her to take her to Charity Hospital as soon as possible.[12]

On May 1, 2006, the day the defense presented its entire case and the government began its rebuttal, Fawer filed a motion seeking to compel Carraby and Hurley to provide handwriting samples so that the defense could have a handwriting expert determine whether the form was written in the hand of either Carraby or Hurley.  According to Fawer's motion, the handwriting analysis was necessary because "[e]ither the putative victim in this case [Carraby] is lying about signing the complaint at issue or the Government's key corroborating witness submitted a forged official document to the Louisiana Bar Association setting forth an account of the events at odds with the testimony of Ms. Carraby."[13]  Fawer argued that the handwriting analysis would reveal which of the two witnesses was being untruthful.[14]  Although the Court granted Fawer's motion, Fawer notified the Court on May 2, 2006, the final day of trial, that he no longer intended to pursue the handwriting analysis.

Dillon argues that Fawer's performance was deficient in connection with the ethical conduct complaint form.  First, Dillon maintains that Fawer rendered ineffective assistance of counsel because he did not call witnesses that would allow the jury to "fully understand the

---

[12] *Id.*

[13] R. Doc. No. 119, pg. 4.

[14] Although the Court appreciates Fawer's zealous advocacy on behalf of his client, the Court notes that Fawer's argument is potentially flawed as it may be based upon a faulty premise and contain a false dichotomy.  Fawer's argument assumes that either Carraby or Hurley completed the form and, accordingly, one of them had to be lying since they both denied completing it.  The argument overlooks the fact that another person, such as Carraby's father or another family member, may have completed the form.

The argument may contain a false dichotomy because it assumes only two options: either Carraby lied on the witness stand or Hurley lied on the witness stand.  As noted above, it is possible that both women told the truth because neither may have completed the form.  Additionally, assuming without deciding that either Carraby or Hurley completed the form, it is possible that the one who did simply did not remember doing so.

Ethical Conduct Complaint scenario."[15]  As Dillon asserts, "[h]ad Mr. Fawer properly investigated this situation, the jury would have known that Ms. Hurley was the only person that the Disciplinary Counsel communicated with regarding Ms. Carraby.  This information would have discredited Ms. Hurley's claim that she was not familiar with the Ethical Conduct Complaint form."[16]  Second, Dillon contends that Fawer rendered ineffective assistance of counsel by not following through on the argument set forth in his motion by using the ethical conduct complaint form to impeach either Carraby or Hurley.

At bottom, Dillon's argument is that the ethical conduct complaint form was inconsistent with Carraby's testimony that Dillon told her that she had to go to his private law office in order to take a drug test and clear the marijuana charge from her record.  Dillon appears to believe that the contents of the ethical conduct complaint form are so inconsistent with Carraby's testimony (and consistent with Dillon's testimony) that, had Fawer better utilized the form, the jury would not have found that Dillon acted "under color of law" when he raped Carraby.

The Court first notes that the record indicates that Fawer refrained from pursuing the handwriting analysis for strategic reasons.  As Fawer stated to the Court on May 2, 2005 outside the presence of the jury, "in the interest of getting this case to the jury and in view of the fact that we have on the record that it's not Sandy Carraby's signature or handwriting on that document, we will forego the handwriting samples."[17]  Additionally, in his affidavit, Fawer states that:

---

[15] R. Doc. No. 180-1, pg. 13.

[16] *Id*. at 13-14.  The Court concludes that Dillon's argument that Fawer rendered ineffective assistance of counsel by failing to call the attorneys who are alleged to have had some involvement with Hurley when she wrote the letter to the Disciplinary Board is without merit.  Dillon has not presented evidence that such witnesses would have aided his argument.

[17] R. Doc. No. 163, pg. 4.

> Sandy Carraby's testimony that defendant had instructed her to go to his "other office for a drug test" was the subject of intensive cross-examination. That Ms. Hurley wrote a letter to the Louisiana Disciplinary Board was not disputed. Nor was it disputed that Ms. Hurley was advised that only the "victim" could file a complaint and that a subsequent form complaint was submitted ostensibly signed by Ms. Carraby. At trial Ms. Carraby, under cross-examination, admitted she had not signed the complaint thus, in my judgment, obviating the need for a hand writing expert to opine upon the handwriting exemplars previously obtained. In effect, Carraby's testimony verified that she had never filed a complaint with the Disciplinary Board. In my judgment, [the attorneys who are alleged to have had some involvement with Hurley when she wrote the letter to the Disciplinary Board] had no relevant testimony relating to the testimony of Carraby or Hurley. The decision to forego a formal handwriting analysis in light of Carraby's admission was a strategic one to which defendant Dillon, an attorney, was privy.[18]

Accordingly, because the Court must indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance, the Court concludes that Fawer did not render deficient performance under *Strickland* when he decided not to pursue the handwriting analysis of Carraby and Hurley.

Nevertheless, even assuming, without deciding, that Fawer's performance was deficient for neglecting to pursue such handwriting analysis, it is clear from the record that, given the substantial evidence against Dillon, Dillon was not prejudiced by Fawer's alleged failure to further pursue the ethical conduct complaint form. Indeed, there is not "a reasonable probability

---

[18] R. Doc. No. 191-1, pgs. 1-2. Most importantly, the impeachment value of the ethical conduct complaint form and the handwriting exemplars would have been minimal because the ethical complaint form is not inconsistent with the testimony of either Carraby or Hurley. Carraby testified at trial that Dillon told her at the courthouse that she would have to take a drug test in order to remove the marijuana charge from her criminal record. The ethical conduct complaint form states that Carraby went to Dillon's office "to clean up [her] records." The two statements are consistent with one another. Additionally, nowhere on the form do the handwritten responses indicate that Carraby went to Dillon's private law office in order to discuss the possibility of filing a lawsuit in connection with a car accident, as Dillon testified.

that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."

*United States v. Mullins,* 315 F.3d 449, 456 (5th Cir. 2002) (quoting *Strickland,* 466 U.S. at 687).

Further, the Court concludes that Fawer's alleged failings in connection with the ethical conduct

complaint form did not deprive Dillon "of a 'fair trial, a trial whose result is reliable.'"  *United*

*States v. Baptiste,* No. 98-207, 2007 U.S. Dist. LEXIS 21388, at *11 n. 6, 2007 WL 925894

(E.D. La. Mar. 26, 2007) (Engelhardt, J.) (quoting *Strickland,* 466 U.S. at 687).[19]

### b.  Carolyn Carter's Husband

---

[19] The Court observes, as did the Fifth Circuit on appeal, that there was substantial evidence introduced at trial that Dillon acted "under color of law" when he sexually assaulted Carraby.  As the Fifth Circuit stated:

> An action occurs under color of law when there is "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  *United States v. Classic,* 313 U.S. 299, 61 S. Ct. 1031, 1043, 85 L. Ed. 1368 (1941).  The Supreme Court later simplified this formula and stated that "under 'color' of law means under 'pretense' of law."  *Screws v. United States*, 325 U.S. 91, 65 S. Ct. 1031, 1040, 89 L. Ed. 1495 (1945).
>
> . . .
>
> . . . [T]he determining factor of whether a government official [is] acting under color of law generally [is] "whether there [is] a nexus between the victim, the improper conduct and [the defendant's] performance of official duties."[19]
>
> . . . Dillon misled Carraby into believing her marijuana charge was pending and that he could have it dismissed.  The testimony of . . . Carraby indicates that [she] thought that Dillon's position as an ACA put him in a position to help [her].
>
> Nevertheless, the fact that Dillon took advantage of his position to initially become acquainted with his victims does not alone suffice to find that his subsequent assault[] [of Carraby was] under color of law.  There needs to have been a more meaningful nexus between the defendant's use or abuse of his position of actual or ostensible authority and the actual commission of the offense.
>
> Dillon created this nexus when he verbally invoked his power before, during and after he sexually assaulted . . . Carraby. . . .  As to Carraby, Dillon told her that to get her marijuana charge dismissed, which he in effect had led her to believe he could and would do as an ACA, she would have to come to his "other" office for a (completely bogus) marijuana test.  Then, before sexually assaulting her there, Dillon told her that nobody would believe her if she reported him because she had a lewd conduct charge on her record.  Carraby also testified that Dillon warned her not to tell anyone about the assault or he would "come after [her] and [her] family."

*Dillon*, 532 F.3d at 384-86.

Dillon claims that Fawer rendered ineffective assistance by failing to subpoena Carolyn Carter's husband.  According to Dillon, the testimony of Carter's husband would have impeached Carter to the extent that she asserted that she did not have consensual sex with Dillon. Dillon states that, "Ms. Carter asked [her husband] to corroborate her claim of assault against Petitioner, even though she had never discussed the allegation with him . . . [t]he husband responded that he wouldn't give her support because he didn't know what was going on."[20] Dillon claims that had "Fawer properly investigated and subpoenaed [Mr. Carter], the impeachment evidence could have been brought in under Federal Rules of Evidence Rule 804(a)(5) . . . [and] there is a reasonable probability that at least one juror would have looked upon Ms. Carter's testimony unfavorably."[21]

Dillon has not identified with any specificity the evidence that Carter's husband would have supplied or the impact that any such evidence would have had on the outcome of his case. Indeed, Dillon's motion acknowledges that Carter's husband had refused to support Carter

---

Moreover, as the Fifth Circuit observed in its opinion following Dillon's appeal, "[Timika] Jones's testimony that Dillon had told her that he would fix her tickets for $150 or sex is probative because it indicates that Dillon was willing to use his official position to coerce women into having sexual relations with him."  *Id.* at 389.

Given such evidence, any further effort by Fawer to use the ethical conduct complaint form to cast doubt on the color of law element of Dillon's crime would have been fruitless.

[20] R. Doc. No. 180-1, pgs. 35-36.

[21] *Id.* at 36.  The Fifth Circuit has held that "complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative."  *United States v. Cockrell*, 720 F.2d 1423, 1427 (5th Cir. 1983) (quoting *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978)).  Further, the Fifth Circuit "has viewed with great caution claims of ineffective assistance of counsel when the only evidence of a missing witness's testimony is from the defendant."  *Id.* (citing *United States v. Guerra*, 628 F.2d 410, 413 (5th Cir. 1980), *cert denied*, 450 U.S. 934 (1981) ("None of the alleged witnesses were called at the § 2255 hearing and no one knows what they would have testified to.  All we have is what [the respondent] says they would have said.")).

because "he didn't know what was going on."[22]  Dillon offers no persuasive argument or
evidence with respect to why this Court should not "view[] with great caution [Dillon's] claims
of ineffective assistance of counsel [since] the only evidence of a missing witness's testimony [or
lack thereof] is from [Dillon]."  *United States v. Cockrell*, 720 F.2d 1423, 1427 (5th Cir. 1983).

Further, Carter was subjected to vigorous cross-examination during trial with respect to
the rape.  The jury also heard Dillon's side of the story – that he and Carter had consensual sex –
and it rejected it.  As such, Dillon has not demonstrated to the Court a violation of *Strickland*
under either prong of the *Strickland* test.

### c.  Sheena Cheneau

Dillon argues that Fawer rendered ineffective assistance by failing to secure a
handwriting analysis from Sheena Cheneau, one of the two Rule 413 witnesses who testified that
she had been sexually assaulted by Dillon.  Dillon asserts that he had a consensual sex with
Cheneau.  According to Dillon, a handwriting analysis of Cheneau would have allowed Fawer to
impeach Cheneau.  As Dillon maintains, "Ms. Cheneau was less than candid involving the dates
ofencounters, phone records, and checks received in her ongoing relationship with [Dillon]."[23]
Dillon contends that a handwriting analysis would have allowed Fawer to demonstrate that
Cheneau endorsed two checks from Dillon months before he sexually assaulted Cheneau.
Because Cheneau denied endorsing the checks, Dillon believes that her credibility would have
been called into question if the handwriting analysis revealed that she had, in fact, signed the
checks.  As such, Dillon argues that the jury would have concluded that he and Cheneau had a
consensual sexual relationship and the government's case would have been weakened.

---

[22] R. Doc. No. 180-1, pg. 36.

[23] *Id*. at 30.

In his affidavit, Fawer explained why he did not acquire a handwriting analysis with respect to Cheneau:

> Ms. Cheneau's signature on the back of the two checks received from Mr. Dillon matched precisely her signature on a Municpal Court document in evidence.  In my judgment, despite her denial at having received the checks, the record, including defendant's testimony, clearly reflected the Cheneau had received and endorsed the two checks.  A handwriting analysis would have added little to the record, particularly in light of the documentary evidence establishing approximately 70 telephone calls between Cheneau and Dillon in the three months after the alleged non-consensual sexual assault.[24]

Accordingly, because the Court must indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance, the Court concludes that deficient performance by Fawer has not been demonstrated with respect to Cheneau.

Nevertheless, even assuming, without deciding, that Fawer was ineffective for failing to secure an analysis of Cheneau's handwriting, Dillon has not demonstrated that he suffered *Strickland* prejudice as a result of such failure.  As mentioned above, even without Cheneau's testimony, there was substantial evidence from which the jury could conclude that Dillon was guilty of the two rapes under color of law that he was charged with committing.

### 2. *Fawer's Alleged Conflict*

Dillon maintains that Fawer was ineffective by "fail[ing] to avoid conflicts of interest, or to inform [Dillon] of such . . . ."[25]  Specifically, Dillon alleges that Fawer "pulled his punches" at trial in order to please the government because the government was investigating Fawer at the

---

[24] R. Doc. No. 191-1, pg. 2.

[25] R. Doc. No. 180-1, pg. 40.

time of Dillon's trial for Fawer's alleged involvement with former St. Tammany Parish

Councilman Joe Impastato[26]  In his reply to the government's opposition, Dillon states:

> Defense Attorney Michael S. Fawer, United States Attorney Jim Letten and
> his assistants conspired together to defraud the Federal District Court in the
> Eastern District of Louisiana.  They purposefully concealed from District
> Court Judge Lance Africk and the Petitioner the fact that, while Mr. Fawer
> represented Petitioner during a federal criminal investigation and trial,
> Fawer was himself under a federal criminal investigation by Mr. Letten's
> office of his own conduct in a separate matter.[27]

Beyond these allegations, Dillon does not offer any evidence to substantiate such claim.

Even assuming, without deciding, that Fawer labored under a conflict of interest during

Dillon's trial as a result of the U.S. Attorney's alleged investigation into his conduct in

connection with the Impastato matter, this Court is unable to presume prejudice pursuant to

*Culyer v. Sullivan*, 446 U.S. 335 (1980).[28]  The Fifth Circuit addressed a substantially similar

issue in *United States v. Goodley*, 183 F. App'x 419 (5th Cir. 2006).  In *Goodley*, the defendant

was convicted in the United States District Court for the Western of Texas on June 6, 1998 of

money laundering and conspiracy with intent to distribute crack cocaine.  *Goodley*, 183 F. App'x

at 420.  Five days after the defendant's conviction, on June 11, 1998, the defendant's lawyer was

also indicted in the Western District of Texas for his role in a separate and unrelated drug

conspiracy.  *Id.*  Following his conviction, the defendant filed a § 2255 motion in which he

argued that his counsel rendered ineffective assistance of counsel due to his conflict of interest.

---

[26] *Id.*

[27] R. Doc. No. 194, pg. 1.

[28]" "In [*Culyer v. Sullivan*, 446 U.S. 335 (1980)], the Supreme Court held that when a lawyer simultaneously
represents multiple defendants, a defendant may be able to establish a limited presumption of prejudice if he can
show that "an actual conflict of interest adversely affected his lawyer's performance."  *United States v. Goodley*,
183 Fed. App'x 419, at *1 (5th Cir. 1006).

Rejecting the defendant's argument that the district court should have presumed prejudice owing

to the defense lawyer's alleged conflict of interest, the Fifth Circuit stated that:

> [t]his court has determined that "[n]ot all conflicts of interest ... [are]
> suited to [*Cuyler v. Sullivan's*] stringent rule," and that "*Strickland* more
> appropriately gauges an attorney's conflict of interest that springs not
> from multiple client representation but from a conflict between the
> attorney's personal interest and that of his client." *Beets v. Scott,* 65 F.3d
> 1258, 1259, 1260 (5th Cir.1995) (en banc); *see also United States v.
> Corona,* 108 F.3d 565, 575 (5th Cir.1997) (refusing to apply *Sullivan* to
> an alleged attorney-client conflict that did not arise from multiple
> representation). Because the *Strickland* standard applies when, as here,
> the quality of representation is alleged to have been affected by the
> attorney's self-interest, the district court correctly determined that
> Goodley's claims should be evaluated under *Strickland's* standard, not
> *Sullivan's.* Recent instruction from the Supreme Court and the recent
> decisions of this court have reaffirmed the strict limitation of *Sullivan* to
> cases involving multiple representation and the application of *Strickland*
> to most other alleged conflicts. *See Mickens v. Taylor,* 535 U.S. 162,
> 174-75, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002) (quoting *Beets,* 65 F.3d
> at 1266, and criticizing courts of appeals that "have applied *Sullivan*
> 'unblinkingly' to 'all kinds of alleged attorney ethical conflicts,' " even
> when the conflict arises because "representation of the defendant
> somehow implicates counsel's personal or financial interests"); *United
> States v. Newell,* 315 F.3d 510, 516 (5th Cir.2002) (stating that *Sullivan's*
> standard is "confined to claims ... that challenge an attorney's divided
> loyalties due to multiple representation," while " *Strickland's* two-
> pronged analysis ... governs all other attorney-client conflicts").

*Goodley*, 183 F. App'x at 423.

Accordingly, in order for Dillon to show that his Sixth Amendment rights were violated

by Fawer's alleged conflict of interest, Dillon must show that he suffered *Strickland* prejudice.

As discussed both above and below, even assuming that Fawer's performance was deficient,

Dillon did not suffer *Strickland* prejudice as the result of any such alleged deficient performance.

The Court further notes that the record is replete with indications that Fawer did not "pull his punches" during trial.  Indeed, at Dillon's sentencing, the Court noted that, in representing Dillon, Fawer had been "a brilliant lawyer who left no stone unturned."[29]

### 3. *Rule 413 and Dillon's Detention Hearing*

Dillon maintains that the government failed to provide notice to him pursuant to Federal Rule of Evidence 413 with respect to the sexual assault witnesses who testified against him at his detention hearing.  As such, Dillon argues that Fawer rendered ineffective assistance of counsel when he did not "appeal" such lack of notice.

Federal Rule of Evidence 413 states that:

> **(a)** In a criminal case in which the defendant is accused of an offense of sexual assault, evidence of the defendant's commission of another offense or offenses of sexual assault is admissible, and may be considered for its bearing on any matter to which it is relevant.
> **(b)** In a case in which the Government intends to offer evidence under this rule, the attorney for the Government shall disclose the evidence to the defendant, including statements of witnesses or a summary of the substance of any testimony that is expected to be offered, at least fifteen days before the scheduled date of trial or at such later time as the court may allow for good cause.
> **(c)** This rule shall not be construed to limit the admission or consideration of evidence under any other rule.

FED. R. EVID. 413.  Dillon's contention that Rule 413 of the Federal Rules of Evidence applies to detention hearings would be a drastic expansion of the plain language of the Rule.  Rule 413 merely requires the government to give notice to a defendant regarding evidence of prior sexual assaults "at least fifteen days before the scheduled date of trial."  FED. R. EVID. 413.  This Court

---

[29] R. Doc. No. 145, pg. 3.  Moreover, the Court was unaware of Fawer's alleged conflict.  Accordingly, the Court had no duty to *sua sponte* conduct a hearing pursuant to *United States v. Garcia*, 517 F.2d 272 (5th Cir. 1975).  *See United States v. Greig*, 967 F.2d 1018, 1022 (5th Cir. 1992) ("While we recognize that a trial court does not always have an affirmative duty to inquire into the possibility of a conflict of interest, it does have a duty to conduct a hearing once it has been alerted and certainly when it knows of the existence of an actual conflict of interest." (footnotes omitted)).

decided, after applying the Rule 403 balancing test, that two of the four proposed witnesses could testify.[30]

As the Fifth Circuit noted on appeal, "[b]efore trial, the government timely gave notice that it was seeking to introduce evidence of four other alleged sexual assaults committed by Dillon under Federal Rule of Evidence 413." *Dillon*, 532 F.3d at 384.[31]  As such, Fawer could not have been deficient in failing to argue that the government did not provide timely notice of the Rule 413 witnesses.  Further, the Court also notes that Fawer did not represent Dillon at the time of the detention, nor did Fawer represent Dillon on appeal.[32]  R. Doc. No. 191-1, pg. 4.  As such, Dillon does not demonstrate how Fawer could have rendered ineffective assistance of counsel with respect to the Rule 413 issue.

Because Dillon's Rule 413 contention is wholly without merit, Fawer's performance with respect to such issue was not deficient.  Counsel's failure or refusal to raise a meritless argument cannot serve as the basis of a successful ineffective assistance of counsel claim.

### 4. *Fawer's Alleged Failure to Investigate Alleged Prosecutorial Misconduct*

#### a. **Alleged Infiltration of Dillon's Defense Team by a Government Informant**

According to Dillon, his defense team was infiltrated by a government informant named Ray Reggie ("Reggie"), the brother-in-law of the late Senator Ted Kennedy.  As Dillon asserts, he along with a lawyer who represented him prior to trial hired Reggie as a media consultant. Nevertheless, Dillon does not allege that Fawer, as trial counsel, knew or had any reason to know of Reggie's earlier involvement with Dillon's case.  Indeed, in his affidavit, Fawer states that he

---

[30] R. Doc. No. 75.

[31] *See also* R. Doc. No. 45.

[32] R. Doc. No. 191-1, pg. 4.

"had no awareness of Ray Reggie being involved in the case prior to my entry into it.  I have no recollection of ever meeting him, nor do I recall ever discussing him with Mr. Dillon."[33]  Because Fawer did not know or have any reason to know of Reggie's involvement with the case, he was not ineffective for not investigating the nature of Reggie's involvement with Dillon's case.

Further, Dillon does not identify or allege with any specificity what information Reggie may have obtained for the government or how the government may have used such information against him.  As Dillon states in his reply to the government's response, "[r]egarding Reggie, his handlers could have very well transmitted information to FBI agents, then to prosecutors."[34]  Apart from such conclusory and undefined assertions, Dillon does not identify how he may have been prejudiced by Reggie's possible involvement with the government.  Dillon seeks an evidentiary hearing in connection with the Reggie issue "in order to explore this issue further."  However, "[d]ue to the speculative and conclusory nature of [Dillon's] allegations" with respect to Reggie's infiltrating his case as an agent of the government, an evidentiary hearing "would serve as nothing more than a fishing expedition."  *United States v. Edwards*, 442 F.3d 258, 268 n.10 (5th Cir. 2006); *see also United States v. Franks*, 397 F. App'x 95, 101 (5th Cir. 2010).  The Fifth Circuit does not allow this.  *See Edwards*, 442 F.3d at 268 n.10; *see also Franks*, 397 F. App'x at 101.  Accordingly, Dillon's *Strickland* argument fails.

> **b.  Fawer's Alleged Failure to Prevent the Government from Perpetuating False and Prejudicial Testimony**

---

[33] R. Doc. No. 191-1, pg. 4.

[34] R. Doc. No. 194, pg. 16.

Dillon argues that Fawer was ineffective for failing to prevent the government from engaging in prosecutorial misconduct when it "introduced outrageous, prejudicial testimony at the detention hearing."[35]  According to Dillon, such evidence "permeated the entire case, because its prejudice was felt from the beginning to end, *even though it was ruled inadmissible by the District Court*."[36]  Dillon's argument, spanning only two paragraphs, is incredibly vague and it does not present a Constitutional argument.

### c.  Fawer's Alleged Failure to Pursue a Politically Motivated Prosecution/Selective Prosecution Defense

Dillon argues that Fawer rendered ineffective assistance because he did not investigate or argue that Dillon was "selectively prosecuted" or that Dillon was subject to a politically motivated prosecution based upon his involvement in Democratic Party politics.  In response, Fawer asserts in his affidavit that Fawer, "considered and rejected a claim of selective prosecution as legally unsupportable."[37]

Dillon posits the following question in his motion: "In the instant case, how many similarly situated defendants were not prosecuted, and how many had their state cases interupted [sic] before the state could even develop its investigation in the case?"[38]  It is utterly unclear to the Court what attributes that Dillon believes that he and the other "similarly situated defendants" described in his motion share.  Accordingly, to the extent that Dillon asserts that Fawer was ineffective for failing to investigate Dillon's alleged selective prosecution on some basis other than his politically affiliation, the Court rejects such claim.

---

[35] R. Doc. No. 180, pg. 55.

[36] R. Doc. No. 180, pg. 55 (emphasis added).

[37] R. Doc. No. 191-1, pg. 4.

[38] R. Doc. No. 180-1, pg. 56.

Dillon argues that Fawer neglected to investigate and argue evidence that would show "a pattern of conduct by political operatives and government officials associated with the Republican party, which U.S. Attorney Jim Letten is so associated, to influence witnesses to commit perjury and to implicate [Dillon] in wrongdoing."[39]  Dillon alleges that Republican Party operatives and government leaders targeted him in 1996, following the election of Senator Mary Landrieu, a Democrat, over Woody Jenkins, a Republican.[40]  Dillon worked on the campaign staff of Senator Landrieu and, after her election, the Senate Rules Committee allegedly investigated Dillon for offenses involving drugs, prostitution, and purchasing votes.[41]

"The standard to prove selective prosecution is a demanding one."  *Scott v. United States*, 232 Fed. App'x 898 (11th Cir. 2007).  In order to establish a claim of selective prosecution, a defendant must "assert that he was prosecuted based on his race or religion or to prevent his exercise of a particular constitutional right."  *United States v. Wright*, 261 F. App'x 736, 737 (5th Cir. 2008) (citing *United States v. Armstrong,* 517 U.S. 456, 465-66 (1996) and *United States v. Webster*, 162 F.3d 308, 333-34 (5th Cir. 1998)).  "[S]elective prosecution occurs when a prosecutor singles out a person belonging to an identifiable class for prosecution*,* initiates the prosecution with a discriminatory purpose, and the *prosecution* has a discriminatory effect on the group to which the defendant belongs."  *United States v. Parker*, 23 F.3d 409, 1994 WL 180295, at *6 (6th Cir. May 10, 1994) (emphasis omitted).  As the Fifth Circuit has explained:

> [S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision, whether or not to prosecute, and what charge to file or bring before a grand jury, generally

---

[39] R. Doc. No. 180, pg. 53.  *United States v. Hastings,* 126 F.3d 310, 313 (4th Cir. 1997) ("A prosecution . . . cannot be motivated by a suspect's exercise of constitutional rights through participation in political activity.")

[40] *Id.;* R. Doc. No. 180-2, pg. 4.

[41] R. Doc. No. 180-2, pg. 4.

rests entirely in his discretion." *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978). The exercise of prosecutorial discretion is limited by the Equal Protection Clause, however. A court's consideration of an Equal Protection-based claim of selective prosecution necessarily begins with a presumption of good faith and constitutional compliance by the prosecutors. *See Armstrong,* 517 U.S. at 465-66, 116 S.Ct. at 1486-87. To overcome this presumption, a defendant must prove both discriminatory effect and discriminatory purpose by presenting "clear evidence." *Id.* at 465, 116 S.Ct. at 1486 (quoting *United States v. Chemical Foundation, Inc.,* 272 U.S. 1, 14-15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926)). Before a criminal defendant is entitled to any discovery on a claim of selective prosecution, he must make out a prima facie case. The prima facie case of selective prosecution requires the criminal defendant to bring forward some evidence that similarly situated individuals of a different race could have been prosecuted, but were not. *Armstrong,* 517 U.S. at 465, 116 S.Ct. at 1487; *United States v. Webster,* 162 F.3d 308, 333-34 (5th Cir.1998). More specifically, a defendant must first present evidence of *both* discriminatory effect *and* discriminatory intent. *Id.*

*In re United States*, 397 F.3d 274, 284 (5th Cir. 2005).

Dillon must prove that Fawer, by failing to investigate and pursue a claim of selective prosecution, performed below the objective standard for reasonableness and, but for Fawer's deficient performance, the result of Dillon's trial would have been different. Dillon has failed to demonstrate to the Court that he had a viable selective prosecution defense. This Court finds that Dillon has failed to demonstrate that his attorney rendered deficient performance in connection with this claim.[42]

### 5. *Alleged Failure to Procure Dillon's Desired Jury Instruction*

Although Dillon was charged with violating 18 U.S.C. § 242, Dillon argues that Fawer was ineffective for failing to persuade the Court to instruct the jury with respect to the elements

---

[42] Having rejected Dillon's selective prosecution claim, the Court finds that the circumstances surrounding Dillon's involvement in politics in the mid-1990s would have been irrelevant to the crimes charged in the underlying criminal proceedings against Dillon in this matter. Dillon does not demonstrate how evidence that he was under investigation in 1996 by "Republican Party operatives and government leaders" has any relevance to his prosecution by the U.S. Attorney for two rapes carried out under color of law in the early 2000s.

of 18 U.S.C. § 2241.  Dillon argues that Fawer was ineffective for failing to obtain a jury

instruction that Dillon desired.[43]  Specifically, Dillon maintains that Fawer was ineffective for

failing to persuade the Court to include § 2241's jurisdictional component.

A jury convicted Dillon of two counts of violating 18 U.S.C. § 242, finding that he

violated his victims' civil right to bodily integrity by sexually assaulting them while acting under

color of law.[44]  18 U.S.C. § 242 states:

> Whoever, under color of any law, statute, ordinance, regulation, or
> custom, willfully subjects any person in any State, Territory,
> Commonwealth, Possession, or District to the deprivation of any
> rights, privileges, or immunities secured or protected by the
> Constitution or laws of the United States, or to different
> punishments, pains, or penalties, on account of such person being
> an alien, or by reason of his color, or race, than are prescribed for
> the punishment of citizens, shall be fined under this title or
> imprisoned not more than one year, or both; and if bodily injury
> results from the acts committed in violation of this section or if
> such acts include the use, attempted use, or threatened use of a
> dangerous weapon, explosives, or fire, shall be fined under this
> title or imprisoned not more than ten years, or both; and if death
> results from the acts committed in violation of this section or if
> such acts include kidnapping or an attempt to kidnap, aggravated
> sexual abuse, or an attempt to commit aggravated sexual abuse, or
> an attempt to kill, shall be fined under this title, or imprisoned for
> any term of years or for life, or both, or may be sentenced to
> death.[45]

By its plain language, § 242 does not contain a jurisdictional requirement that the offense

must have been committed within the special maritime or territorial jurisdiction of the United

States.  Fawer proposed a jury instruction incorporating § 2241's jurisdictional requirement.  The

---

[43] R. Doc. No. 180, pg. 6.  *See also* R. Doc. Nos. 128, 130 and 136.

[44] R. Doc. No. 146, pg. 5.

[45] 18 U.S.C.A. § 242.

Court ultimately rejected such instruction.  This Court instructed the jury on the elements of a 18

U.S.C. § 242 violation.  In doing so, the Court borrowed the aggravated sexual assault element

from § 2241 without the territorial requirement.

Dillon's assertion that Fawer was ineffective for failing to obtain the desired jury

instruction ignores the fact that Dillon was charged with violating § 242 which has no

jurisdictional component.  Fawer did in fact request that this Court add § 2241's jurisdictional

requirement to the jury instructions.[46]  The Court rejected such argument as it was contrary to

law.  Dillon's Strickland claim fails with respect to this issue.

### 6.  *Alleged Ineffective Assistance of Appellate Counsel*

As stated, Dillon hired John Wilson Reed, Esq. ("Reed") to represent him on appeal.

Dillon first argues that Reed provided ineffective assistance on direct appeal by failing to argue

that Fawer provided ineffective assistance at trial.  As the Fifth Circuit has repeatedly explained:

> The general rule in this circuit is that a claim of ineffective assistance of
> counsel cannot be resolved on direct appeal when the claim has not been
> raised before the district court since no opportunity existed to develop
> the record on the merits of the allegations.  Only in those rare occasions
> where the record is sufficiently developed will the court undertake to
> consider claims of inadequate representation on direct appeal.  If we
> cannot fairly evaluate the claim from the record, we must decline to
> consider the issue without prejudice to a defendant's right to raise it in a
> subsequent proceeding.

*United States v. Montes,* 602 F.3d 381, 387 (5th Cir. 2010) (quoting *United States v. Gulley*, 526

F.3d 809, 821 (5th Cir. 2008)) (brackets and internal quotation marks omitted).

Dillon does not demonstrate how his case on appeal involved one of the "rare occasions"

in which "the record is sufficiently developed" to the point that the Fifth Circuit would have

---

[46] R. Doc. No. 86, pgs. 6-7.  Mr. Fawer requested that the jury instruction read: "Furthermore, in order to find that aggravated sexual abuse occurred as to each count, you must find beyond a reasonable doubt that the sexual abuse alleged in that count occurred in federal territory or federal maritime territory [as defined by 18 U.S.C. § 7]."

considered an ineffective assistance of counsel claim on direct appeal from his criminal conviction.  As such, any attempt by Reed to raise such a claim on appeal would have been meritless.  Accordingly, Reed did not render ineffective assistance to Dillon by failing to argue on direct appeal that Fawer was ineffective at trial.

Second, Dillon argues that Reed provided ineffective assistance by failing to file a writ of certiorari with the United States Supreme Court.  Dillon asserts that he hired Reed to file a writ of certiorari.  Reed has sworn under oath that he did not agree to file a writ of certiorari on Dillon's behalf.[47]

Regardless of whether Reed did or did not agree to file a writ of certiorari on Dillon's behalf, the alleged failure to file such writ did not deprive Dillon of his Sixth Amendment right to effective assistance of appellate counsel.  As the United States Court of Appeals for the Seventh Circuit recently held, such an argument is "a non-starter."  *Wyatt v. United States*, 574 F.3d 455, 459 (7th Cir. 2009).  The Seventh Circuit explained:

> The Supreme Court held in *Ross v. Moffitt*, 417 U.S. 600, 617, 94 S. Ct. 2437, 41 L. Ed. 2d 341 (1974), that a criminal defendant has no constitutional right to counsel to pursue a petition for a writ of certiorari.  And where there is no constitutional right to counsel, there cannot be constitutionally ineffective assistance of counsel.

*Id*. (collecting cases); *see also Clark v. Johnson*, 227 F.3d 273, 283 (5th Cir. 2000) (addressing right to counsel on direct appeal) (" . . . [T]he Supreme Court has not extended the right of counsel to discretionary review.  Due Process does require the appointment of effective counsel for a criminal appellant pursuing a first right of appeal.  However, *Ross v. Moffitt*, 417 U.S. 500, 610, 94 S. Ct. 2437, 41 L. Ed. 2d 341 (1974), held that it was constitutional under due process to

---

[47] R. Doc. No. 191-2, pg. 2.

not provide counsel on discretionary appeal. . . .   The Supreme Court has defined its review as

discretionary . . . .") (internal citation omitted).   Because Dillon had no constitutional right to

counsel in seeking discretionary review in the Supreme Court, Dillon cannot claim

constitutionally ineffective assistance of counsel based on Reed's alleged failure to file a timely

petition for a writ of certiorari.  *Id*.

### *CONCLUSION*

Accordingly, **IT IS ORDERED** that Dillon's motion to vacate, set aside, or correct his

sentence and/or conviction pursuant to 28 U.S.C. § 2255 is **DENIED** and that Dillon's

application is **DISMISSED WITH PREJUDICE**.


New Orleans, Louisiana, March _____31st_____, 2011.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**